Filed 7/24/15  Japanese Village v. Los Angeles County MTA CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JAPANESE VILLAGE LLC,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY,<br><br>    Defendant and Respondent. | B259725<br><br>(Los Angeles County<br>Super. Ct. No. BS137343)<br><br><br>ORDER MODIFYING OPINION [CHANGE IN JUDGMENT] |

The opinion filed on July 9, 2015, is modified as follows:

On page 1, line 2, change "Affirmed" to "Affirmed in part, dismissed in part."

On page 23, at the conclusion of the second paragraph, add "The cross-appeal is dismissed as moot.  The parties are to bear their own costs incurred on cross-appeal."

_____    _____    _____
TURNER, P.J.                MOSK, J.                KIRSCHNER, J.*

_____

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JAPANESE VILLAGE LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LOS ANGELES COUNTY<br>METROPOLITAN TRANSPORTATION<br>AUTHORITY,<br><br>    Defendant and Respondent. | B259725<br><br>(Los Angeles County<br>Super. Ct. No. BS137343) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed.

Crockett & Associates and Robert D. Crockett; Latham & Watkins and Benjamin J. Hanelin for Plaintiff and Appellant.

Mark J. Saladino, County Counsel, Charles M. Safer, Assistant County Counsel, and Ronald W. Stamm, Principal Deputy County Counsel; Remy Moose Manley, Whitman F. Manley, Tiffany K. Wright, Jennifer S. Holman and Jeannie Lee for Defendant and Respondent.

# I. INTRODUCTION

Plaintiff, Japanese Village LLC, is the owner of the Japanese Village Plaza in the Little Tokyo neighborhood of Downtown Los Angeles. Defendant, The Los Angeles County Metropolitan Transit Authority, is constructing three subway stations and an underground subway through Downtown Los Angeles. The project is entitled the Regional Connector Transit Connector Project. The subway will directly link the 7th Street/Metro Center Station located at 7th and Figueroa Streets to the Metro Gold Line light-rail system in Little Tokyo.

Because of partial federal funding for the project, the Federal Transit Administration was required to conduct environmental review pursuant to the National Environmental Policy Act. (42 U.S.C. § 4321 et seq.) Under these circumstances, an environmental impact report/environmental impact study must be jointly prepared by federal and local authorities. (*Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2008) 44 Cal.4th 459, 472; Cal. Code of Regs., tit. 14, § 15220 et seq,) For clarity's purpose, the final environmental impact report/environmental impact study will be referred to as the environmental impact report.

Plaintiff appeals from the denial of its mandate petition and declaratory relief complaint which upheld defendant's certification of the environmental impact report. Plaintiff's challenges arise under the California Environmental Quality Act. (Pub. Resources Code[1], § 21000 et seq.) We are only reviewing the environmental impact report for violations of the California Environmental Quality Act even though it was jointly prepared by federal authorities. Defendant contends in its cross-appeal that the project is exempt from environmental review. We conclude the trial court correctly ruled defendant could properly certify the environmental impact report as it relates to the Japanese Village Plaza. Because we conclude the trial court correctly upheld the environmental impact report's certification, we dismiss defendant's cross-appeal as moot.

---

[1] All further section references are to the Public Resources Code unless otherwise indicated.

2

## II. PLAINTIFF'S CHALLENGES TO THE ENVIRONMENTAL IMPACT REPORT'S CERTIFICATION

### A . Plaintiff's Verified Mandate Petition and Declaratory Relief Complaint

On May 21, 2012, plaintiff filed its verified mandate petition and declaratory relief complaint. According to the petition and complaint, plaintiff owns a 92,000 square foot property with retail, dining and office venues. The petition and complaint identifies various deficiencies in the environmental impact report which thereby violates the California Environmental Quality Act. The first cause of action seeks issuance of a writ of mandate because the environmental impact report does not comply with specified California Environmental Quality Act provisions. Specifically, plaintiff alleges: the draft environmental impact report fails to propose a specific, identifiable project; the draft environmental impact report fails to develop alternatives and mitigation measures to avoid or substantially lessen significant ecological effects; the environmental impact report mischaracterizes the nature and extent of many of the project's ecological effects; the environmental impact report lacks a detailed analysis of many of the project's significant ecological consequences on Japanese Village Plaza in particular and the Little Tokyo community in general; and among the matters which are not the subject of an appropriate detailed analysis are parking issues, land use restrictions and noise impacts from the construction and operation of a subway and station.

Further, plaintiff alleges that the inadequate analysis is confirmed by postponed studies relating to the project's design and construction phases. The necessary studies and surveys which have been postponed include: a traffic management and construction mitigation plan; a construction mitigation program; structural surveys to establish ground-movement and loss potential; a verification of the location of underground utilities; confirmation of construction haul routes; monitoring requirements for total construction; a parking needs assessment for Little Tokyo; further design features for the

3

First Street/Central Avenue station; a cost-benefit analysis relating to the use of a single tunnel boring machine; and conducting subsurface geotechnical investigations.

In addition, the first cause of action alleges: there should have been recirculation of the environmental impact report after material changes were made to the noise impact analysis from that in the draft environmental impact report; the environmental impact report fails to analyze the significant ecological effects caused by reasonably foreseeable future development; defendant failed to adopt feasible alternatives to locating the project beneath Japanese Village Plaza; and defendant failed to adopt feasible mitigation measures that would resolve parking, noise, future development and subsidence impacts. And, according to the first cause of action, defendant's findings and statement of overriding considerations are not supported by substantial evidence. Finally, the first cause of action alleges: "[Defendant] was required to make specific findings [concerning the absence of feasible mitigation measures] and discuss the '[s]pecific economic, legal, social, technological, or other considerations' that outweigh these significant, unavoidable impacts. ([] § 21081.) [Defendant] failed to do so, and its Findings of Fact and Statement of Overriding Considerations, therefore, fail as a matter of law."

The second cause of action seeks declaratory relief. The basis of plaintiff's declaratory relief claim is that defendant violated the California Environmental Quality Act by certifying the environmental impact report. The petition and complaint seeks: a writ of mandate directing defendants to set aside its approval of the project and certification of the environmental impact report; to cease all activities related to the construction of the project until there is compliance with the California Environmental Quality Act; a writ of mandate directing defendant to stop construction of the project until a proper environmental impact report has been prepared; a declaratory judgment that defendant's certification of the environmental impact report violates the requirements of the California Environmental Quality Act; injunctive orders preventing defendant from proceeding with the project until a legally sufficient environmental impact report has been prepared; and attorney fees and costs.

4

Plaintiff moved to file an amended mandate petition. The trial court never issued a definitive ruling on plaintiff's amendment motion. Thus, plaintiff's operative pleading is the original petition and complaint.

## B. Plaintiff's Trial Brief

The trial brief identifies the following issues: the environmental impact report fails to adequately evaluate noise impacts both during the project's construction and long-term operation; the environmental impact report is deficient because it fails to properly assess parking impacts; the environmental impact report's last minute change to the subway route merely shifts previously identified ecological effects and amplifies them; the environmental impact report fails to adequately analyze land use and subsidence repercussions; the environmental impact report improperly defers analysis of numerous aspects of the project; and the statement of overriding considerations is deficient. The argument portion of plaintiffs' trial brief asserts: the environmental impact report fails to address significant impacts on Little Tokyo; the factual findings and overriding considerations statement misrepresents the information contained in the environmental impact report; defendant failed to adopt feasible and enforceable mitigation measures; mitigation measures were improperly deferred; and defendant failed to adopt a feasible alternative that would reduce project impacts.

Plaintiff's reply argues: significant construction noise impacts have not been mitigated; defendant improperly rejected a feasible mitigation measure to reduce operational noise impacts; no adequate study was made of parking impacts on Little Tokyo; defendant failed to evaluate land-use impacts resulting from the acquisition of underground easements in a dense urban area; there was improper deferral of analysis concerning numerous impacts; and defendant violated unspecified provisions of the California Environmental Quality Act by rejecting a feasible alternative with fewer ecological effects. In addition, plaintiff addressed defendant's exemption contention. Other than in connection with a ground-borne noise and vibration issue, plaintiff never

5

argued defendant failed to adequately respond to comments to the draft environmental impact report.

## C.  Challenges on Appeal

Plaintiff presents four principal challenges to defendant's certification of the environmental impact report.  First, plaintiff challenges determinations made in connection with ground-borne noise and vibration impacts, both in terms of construction and day-to-day subway operations.  In this regard, plaintiff contends there is no substantial evidence defendant's mitigation measures would have reduced noise and vibration impacts to less than significant levels.  Second, plaintiff contends defendant did not study nor properly mitigate the project's parking impacts.  Third, plaintiff asserts defendant did not properly mitigate subsidence risks.  Fourth, plaintiff contends that defendant's responses to comments concerning noise, vibration, parking and subsidence were inadequate.

## III.  STANDARD OF REVIEW

The gravamen of plaintiff's contentions is the environmental impact report's discussion is flawed and fails to meet statutory requirements for good-faith investigation and disclosure.  An environmental impact report's fundamental purpose is to inform public officials and the people they serve of any significant adverse effects a project is likely to have on the environment.  (§ 21061; *Neighbors for Smart Rail v. Exposition Metro Line Const. Authority* (2013) 57 Cal.4th 439, 447; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428.)  We presume the correctness of defendant's decisions in the environmental impact report context.  (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 11; *State Water Resources Control Board Cases* (2006) 136 Cal.App.4th 674, 723.)  Our Supreme Court has described the limited nature of our review:  "In reviewing agency

6

actions under [the California Environmental Quality Act], . . . section 21168.5 provides that a court's inquiry 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.'" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564; see *Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 195.)

Thus, our standard of review depends upon the nature of the challenge to an environmental impact report: "In evaluating an [environmental impact report] for [California Environmental Quality Act] compliance, then, a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is predominantly one of improper procedure or a dispute over the facts. For example, where an agency failed to require an applicant to provide certain information mandated by [the California Environmental Quality Act] and to include that information in its environmental analysis, we held the agency 'failed to proceed in the manner prescribed by [the California Environmental Quality Act].' (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236; see also *Santiago County Water Dist. v. County of Orange* [(1981)] 118 Cal.App.3d [818], 829 [[environmental impact report] legally inadequate because of lack of water supply and facilities analysis].) In contrast, in a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' (*Laurel Heights* [*Improvement Assn. v. Regents of University of California* (1988) ] 47 Cal.3d [376,] 393), the agency's conclusion would be reviewed only for substantial evidence." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*, *supra*, 40 Cal.4th at p. 435.) The gravamen of all of plaintiff's contentions relate to its factual disagreements with the environmental impact report's conclusions. Thus, our standard of review as to defendant's environmental conclusions is for substantial evidence.

In terms of the correctness of defendant's environmental conclusions, our Supreme Court has explained: "Thus, the reviewing court '"does not pass upon the correctness of the [environmental impact report's] environmental conclusions, but only

7

upon its sufficiency as an informative document.'" [Citations.] We may not set aside an agency's approval of an [environmental impact report] on the ground that an opposite conclusion would have been equally or more reasonable." (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 564, quoting *Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 392 and *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 189.) In a similar vein, our Supreme Court has explained: "'A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so.'" (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 572 citing *Laurel Heights Improvement Assn. v. Regents of University of California*, *supra*, 47 Cal.3d at p. 393.) Therefore, we defer to defendant's resolution of conflicting engineering opinions and evidence. (*Western States Petroleum Assn. v. Superior Court*, *supra*, 9 Cal.4th at p. 572; accord *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1042.)

## IV. PLAINTIFF'S APPEAL

### A. Ground-Borne Noise and Vibration

#### 1. The setting

Plaintiff is the owner of the Japanese Village Plaza located in the Little Tokyo district of Los Angeles. The environmental impact report describes Little Tokyo thusly: "Little Tokyo is a unique cultural community in downtown Los Angeles because it has the largest Japanese-American community in the continental United States . . . . Little Tokyo is one of only three remaining Japantowns in the United States (in addition to San Francisco and San Jose). Little Tokyo has a range of mixed-uses including retail, hotel,

8

office, and commercial spaces." According to the environmental impact report and the administrative record, the Japanese Village Plaza is a retail and office facility. More than 40 businesses operate in the Japanese Village Plaza. The businesses in the area were characterized by Evelyn Yoshimura, a member of the Little Tokyo Service Center, as the "heart and soul" of the neighborhood.

The issues relevant to ground-borne noise and vibration arise because the project involves construction of two subway tunnels directly beneath the Japanese Village Plaza. And after construction, subway cars will operate directly beneath the Japanese Village Plaza. The environmental impact report describes the Japanese Village Plaza as a sensitive land use. Plaintiff argues that the tunnels are approximately 13 to 15 feet underground the Japanese Village Plaza. However, the tunnels are passing 13 to 15 feet below plaintiff's parking garage. The tunnels in fact will pass 25 feet beneath those portions of the Japanese Village Plaza where the land use would be sensitive to annoying noise and vibration. Such sensitive areas are places for sleeping or quiet concentration.

## 2. The environmental impact report's assessment of noise and vibration resulting from construction and operation.

### a. Criteria and consultants

In order to measure construction and operational noise and vibration impacts, defendant relied upon the Federal Transit Authority criteria for ground-borne vibration and ground-borne noise. Plaintiff does not challenge defendant's selection of the Federal Transit Authority criteria for ground-borne vibration and noise. According to the environmental impact report, ground-borne noise is created when a vibration source causes a low-frequency rumble sound within a building. The environmental impact report explains: "[The Federal Transit Administration] has developed impact criteria for ground-borne vibration . . ., which is expressed as a velocity level in units of VdB, and ground-borne noise . . . due to transit project construction and operation of transit

9

vehicles. . . . [Ground-borne noise] is created when a vibration source such as a train pass-by causes vibration of floors and walls in nearby buildings resulting in a low frequency rumble sound within the building. Impacts of [ground-borne noise] are particularly important for underground transit operations because, depending on the soil type, tunnels more efficiently transmit vibration to the surrounding soil than surface track structures." Thus, ground-borne noise results from vibrations caused by subway construction and operations.

The environmental impact report engages in a comprehensive analysis of noise and vibration levels. As noted, ground-borne vibration is measured technically in units of VdB. Ground-borne noise is measured in dBA units. The environmental impact report engages in this analysis in the context of subway construction and subsequent operation. The Federal Transportation Administration considers "a qualitative assessment is appropriate" where prolonged construction impacts are not anticipated. In contrast, there are certain quantitative or significance criteria which are applicable to prolonged construction. Several reports prepared by the Wilson Ihrig & Associates consulting firm with assistance from other engineering concerns assessed the frequency and levels of ground-borne vibration and noise impacts. We will examine the professional assessments of ground-borne noise and vibration at the Japanese Village Plaza in greater detail shortly.

As noted, the environmental impact report relied upon the previously mentioned studies conducted by Wilson, Ihrig & Associates, acoustical and vibration consultants located in California, New York and Washington. In addition, defendants relied upon acoustical and vibration studies conducted by Parsons Brinckerhoff, Inc. in 2009. Many of the documents refer to the Parsons Brinckerhoff, Inc. firm as PB. The degreed Parsons Brinckerhoff, Inc. staff identified in the administrative record include: Amanda Elioff, P.E. a senior project manager with over 26 years of geotechnical engineering experience who had authored 19 articles; Dawn L. McKinstry a senior project manager and urban planner with 29 years experience in planning and travel demand forecasting; Donald J. Emerson, an urban planner with 40 years of experience with planning experience in

10

numerous states; Dr. Eugene J. Kim who had 15 years experience in transportation planning, transit system design and related systems management; Kevin Keller, a noise analyst and environmental planner with 22 years experience conducting noise and technical studies in the West Coast, Midwest and Honolulu; Raymond K.Y. Choy, P.E., a senior project engineer with extensive experience in highway and rail development in California, the Philippines and the Peoples Republic of China; Will H. Willson, a risk manager with 34 years of experience in Canada, the United Kingdom, Ireland and Hong Kong; and Zafer Mudar, P.E., a supervising engineer with 17 years of engineering experience with a special emphasis in light rail design.

b. Vibration and noise levels during construction and subway operations

The environmental impact report analyzes ground-borne noise during *construction* and later during the *subway operations*. The environmental impact report analyzes these significant subway operation impacts in VdB and dBA units; ground-borne vibration and noise levels respectively. During subway construction, a tunnel boring machine will be used. The tunnel boring machine's use during subway construction will result in potentially significant impacts to office uses in the Japanese Village Plaza.

The environmental impact report concludes that the tunnel boring machine could result in ground-borne vibration and noise at levels of 86 VdB and 51 dBA respectively. The federal annoyance criteria for a quiet office for occasional events is 78 VdB and 43 dBA for ground-borne vibration and noise levels. For infrequent events, the federal quiet office annoyance criteria for ground-borne vibration and noise levels for is 83 VdB and 48 dBA. Thus, even though the maximum vibration and noise from the tunnel boring machine would be occasional or infrequent, they would potentially result in a significant environmental impact. The environmental impact report concludes during construction, "Even though this maximum vibration and noise from the [tunnel boring machine] operations would be occasional or infrequent, the [tunnel boring machine] activities

11

would potentially exceed the annoyance criteria listed above for occasional or frequent events at the . . . [Japanese Village Plaza] . . . which would result in a significant impact."

Also during construction, delivery trains are expected generate infrequent ground-borne noise and vibration events. However, because of the infrequent use of the delivery trains, the environmental report indicates there would be no impact under the federal annoyance criteria. The environmental impact report assesses the ground-borne vibration and noise level for delivery trains at 64 VdB and 42 dBA respectively. But, depending on the location of the office in the Japanese Village Plaza, a higher ground-borne vibration and noise level could reach 61 VdB and 36 dBA respectively. This is roughly 10 percent of the vibration and noise levels for construction performed by the tunnel boring machine. The Wilson Ihrig & Associates July 12, 2011 memorandum explains that the Federal Transportation Administration assesses the expected 30 trains per day as an infrequent event. Therefore, under the Federal Transportation Administration vibration and noise criteria, no significant impact will result from the use of delivery trains: "Ground[-]borne noise and vibration would also be generated by delivery trains in the tunnel during construction. These slow moving trains would possibly have wheel flats or operate on jointed construction rails, and it is estimated that the vibration would be on the order of 5 to 10 [decibels] less than that generated by [plaintiff's] operations. . . . These levels would be less than the criteria for infrequent events and thus no impact would occur from delivery trains." (Fn. omitted.) The Federal Transportation Authority identifies the ground-borne vibration impact criteria for occasional or infrequent events for a quiet office as 78 or 83 VdB respectively. Under the federal standards, an occasional event would involve 70 vibration events from the same source per day. Thus, even without the use of mitigation strategies, the use of slow-moving delivery trains during construction would have no significant impact.

As to noise related impacts, the environmental impact report states: "While not generally likely, some [ground-borne noise] from underground construction activity such as tunneling could occasionally be audible. However, this [ground-borne noise] would be temporary and of short duration as the construction activity moves along the project

12

alignment." This analysis occurs in the context of a discussion of impacts assuming no mitigation occurs. As noted, the environmental impact report relies on statistical analysis provided by the Wilson, Ihrig & Associates and Parsons Brinkerhoff, Inc. firms.

It bears emphasis the July 2011 Wilson, Ihrig and Associates report focuses on noise and vibration significant impacts for a quiet office environment. There is a less precise impact analysis for what is called a *general assessment* of ground-borne noise and vibration levels. Under the less precise general assessment analysis levels, with a category 3 institutional landowner such as plaintiff, there would still be no significant noise and vibration impacts. The variations in annoyance levels are delineated in the administrative record.

### c. Subway operation vibration and noise impacts

In terms of subway operations, without mitigation, the potentially significant ground-borne noise impacts for a sensitive land use would exceed the Federal Transit Authority annoyance criterion for frequent events. The environmental impact report calculates that, without mitigation, with a single pass by a subway train, potentially between 24 and 47 dBA would be generated under the Japanese Village Plaza. This ground-borne noise level would potentially exceed the Federal Transit Authority annoyance criterion for frequent events of 40 dBA. Thus, absent the implementation of mitigating measures, subway operations at the Japanese Village Plaza could involve potentially significant ground-borne noise impacts for a sensitive land use. In the event of two subway trains passing by at the same time, the ground-borne noise level would be increased to 50 dBA. Two subway trains passing underneath the Japanese Village Plaza is characterized under the Federal Transit Administration annoyance criterion as an occasional/infrequent event. According to the environmental impact report, this would be an infrequent event. The federal annoyance level for occasional/infrequent events for the Japanese Village Plaza is 43 dBA. Absent mitigation, the ground-born noise level when two subway trains passed simultaneously is expected to be 50 dBA, above the

13

federal annoyance level. Thus, without mitigation, for occasional/infrequent events, the simultaneous passage of two subway trains is expected, according to the environmental impact report, to have potentially significant impacts. The development of the foregoing statistical noise and vibration data was result of additional studies conducted in May 2011 after the filing of the initial environmental impact report. And it bears emphasis, the source noise level calculations were from both the Parsons Brinkerhoff, Inc. and Wilson Ihrig & Associates firms.

However, with the adoption of the mitigation measures identified in the environmental impact report, each of these significant impacts will be reduced to less than significant effect. We will synthesize the mitigation impacts shortly in the technical reports supporting the conclusions of the environmental impact report. We now turn to plaintiff's contention that the mitigation measures fail to reduce the significant impacts below those identified utilizing the Federal Transit Administration annoyance levels.

3. Plaintiff's contentions concerning the absence of substantial evidence to support defendant's findings concerning environmental impact report's discussion of the effectiveness of the noise and vibration mitigation measures have been forfeited.

Plaintiff's opening brief fails to identify most of the noise and vibration mitigation measures discussed in the environmental impact report. Defendant argues the failure to identify the mitigation measures and argue their insufficiency forfeits these issues on appeal. Defendant is correct, the opening brief barely mentions the extensive mitigation measures. The opening brief fails to discuss the extensive technical data that supports the environmental impact report's mitigation measure conclusions. Thus, in all respects, the entire issue of whether the mitigation measures reduced the adverse noise and vibration ecological effects to less than significant impacts has been forfeited. (*Mani Brothers Real Estate State Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1402; *Citizens Opposing a Dangerous Environment v. County of Kern* (2014) 228 Cal.App.4th 360, 380, fn. 16.)

14

4. The environmental impact report's comprehensive discussion of the effectiveness of the noise and vibration mitigation measures relevant to subway construction is supported by substantial evidence.

As to construction related impacts, there is substantial evidence the mitigation measures will reduce vibration and noise impacts on the Japanese Village Plaza to insignificant levels. As noted, the subway will be constructed underground by means of two tunnels. Construction will involve the use of a tunnel boring machine which can cause significant vibration and noise impacts.

The environmental impact report imposes a number of mitigation measures including: limiting the types of construction-related vibration near sensitive areas; implementation of a vibration monitoring system to insure no damage results to sensitive buildings like the Japanese Village Plaza; imposing distance limitations on construction near sensitive locations; use of less vibration-intensive construction equipment; routing heavily-laden vehicles and earth moving equipment away from vibration-sensitive locations; avoiding the simultaneous use of vibration-producing construction activity; limiting construction activities during nighttime hours; utilization of devices with the "least impact" necessary to accomplish construction tasks; the use of non-impact demolition and construction methods; procedures for responding to noise complaints; use of higher performance mufflers during nighttime hours; utilizing portable noise sheds; minimization of jacking and pressing operations; maintenance of machinery in good working order; limiting delivery train speeds; the use of a resilient mat which will reduce ground-borne levels by at least four dBA; the use of a conveyor system rather than a delivery train; and a re-analysis of noise levels and use of high compliance resilient fasteners in the vicinity of the Japanese Village Plaza offices. And, if during the short time when the tunnel boring machine is utilized and the Federal Transportation Agency annoyance criteria is exceeded, residents are to be offered temporary relocation. These mitigation factors must be viewed in the context of the fact construction will last for only

15

about three days for each of the two tunnels under any particular building.  The environmental impact report concludes with the utilization of the foregoing mitigation measures the noise and vibration impacts will be less than significant.  The environmental impact report's findings are confirmed by the analysis in the Wilson Ihrig & Associates July 12, 2011 report.  The Wilson Ihrig & Associates July 12, 2011 report is consistent with the firm's March 28, 2012 analysis.  The Wilson Ihrig & Associates July 12, 2011 report, which relies in part on research conducted by the Parsons Brinkerhoff, Inc. engineers, constitutes substantial evidence concerning construction-related environmental impacts.

5.  The environmental impact report's comprehensive discussion of the effects of the noise and vibration mitigation measures as to the operational impacts is supported by substantial evidence.

In terms of subway operation ground-borne noise and vibration impacts, substantial evidence supports the finding that mitigation measures have reduced the environmental impacts to less than significant levels.  As noted, the criteria for determining annoyance levels is that specified by the Federal Transit Administration. The environmental impact report lists numerous mitigation measures designed to reduce noise and vibration impacts to insignificant levels.  Mitigation measure NV-29 expressly requires that the ground-borne noise be below the Federal Transportation Administration annoyance criteria:  "In the vicinity of the offices at Japanese Village Plaza . . . [defendant] shall conduct engineering studies during final design to verify initial estimates of [ground-borne noise] and shall implement high compliance resilient fasteners *or other appropriate measures* as needed to eliminate impacts and reduce ground-borne noise below [Federal Transportation Administration] annoyance criteria." (Italics added.)  Further, mitigation measure NV-27 expressly requires the use of various techniques to reduce operational noise levels below the Federal Transportation Administration annoyance criteria:  "In the vicinity of the Walt Disney Concert Hall and

16

the Colburn School, [defendant] shall implement resiliently supported fasteners, *isolated slab track*, or other appropriate measures as needed to eliminate impacts and to reduce [ground-borne noise] below [Federal Transportation Administration] annoyance criteria." (Italics added.)  The March 28, 2012 Wilson Ihrig & Associates 17-page report expressly identifies these mitigation measures as the types of construction techniques which will reduce operational ground-borne noise impacts to insignificant levels.  The April 24, 2012 report of Dr. Hooshang Khosrovani confirms the March 28, 2012 Wilson Ihrig & Associates analysis is based on normal engineering practice.  Substantial evidence supports defendant's operational noise and vibration conclusions.

Plaintiff is correct about one aspect of mitigation measure NV-27.  Mitigation measure NV-27, as it appears in the environmental impact report, does not require the use of isolated slab track technology under the Japanese Village Plaza.  Isolated slab track technology involves pouring a concrete slab on top of a continuous elastomeric mat. Thus, plaintiff contends that this important technology is unavailable under the Japanese Village Plaza.

Omitting the isolated slab track technology from mitigation measure NV-27 as it relates to plaintiff is entirely harmless.  (§ 21005, subds. (a)-(b); *Neighbors for Smart Rail v. Exposition Metro Line Construction Authority, supra,* 57 Cal.4th at p. 463.) Mitigation measure NV-27 requires defendant to use "high compliance resilient fasteners *or other appropriate measures*" at the Japanese Village Plaza to reduce ground-borne noise below federal annoyance levels.  (Italics added.)  Thus, defendant is obligated to use "other appropriate measures" to bring ground-borne noise below the federal annoyance levels under the Japanese Village Plaza.  Nothing in mitigation measure NV-27 prohibits the use of isolated slab track technology under the Japanese Village Plaza. Of consequence, the March 28, 2012 Wilson Ihrig & Associates report suggests minimizing changing track types.  The report explains it would be acceptable to use one type of mitigation throughout the subway line.  This can be accomplished so long as the

17

mitigating measure provides equal or superior mitigating impact to others listed in the report.

Complicating matters from plaintiff's perspective, it is clear defendant intends to use isolated slab track technology beneath the Japanese Village Plaza. The April 26, 2012 minutes of defendant's directors board meeting expressly states the use of isolated slab track technology at Japanese Village Plaza is part of mitigation measure NV-27. According to defendants' directors board's minutes, mitigation measure NV-27 was intended to state in part: "In the vicinity of the Walt Disney Concert Hall, *the Japanese Village Plaza* and the Colburn School, [defendant] shall use resiliently supported fasteners, isolated slab track, or other appropriate measures as needed to eliminate impacts and to reduce [ground-borne noise] below [Federal Transportation Authority] annoyance criteria." (Italics added.) Thus, defendant's directors board intended that the isolated slab track technology be utilized under the Japanese Village Plaza and it be in the environmental impact report. Its omission from the version of mitigation measure NV-27 in the environmental impact report was a harmless clerical error.

To sum up, omitting the reference to the isolated slab track technology and the Japanese Village Plaza in mitigation measure NV-27 is harmless error. Mitigation measure NV-27 in the environmental impact report, which refers to the Japanese Village Plaza, does not *preclude* the use of isolated slab track technology. And mitigation measure NV-27, which references Japanese Village Plaza, requires the use of "other appropriate measures as needed" to reduce ground-borne vibration and noise levels below federal annoyance levels. Also, defendant is committed to using the isolated slab track if needed. The version of mitigation measure NV-27 appearing in the directors board's minutes expressly states it is to be used below the Japanese Village Plaza. Moreover, it is anticipated that the isolated slab track technology is to be used several blocks away from the Japanese Village Plaza. Mitigation measure NV-27 requires its use at the Colburn School and the Walt Disney Concert Hall. The March 28, 2012 Wilson Ihrig & Associates report suggests minimizing changing track types. Finally, the omission of the isolated slab track technology language from mitigation measure NV-27 did not prevent

informed decision-making or public participation. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority*, *supra*, 57 Cal.4th at pp. 463-464; see 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2014) §§ 23.36-23.37, pp. 23-45-23-48.) We need not address plaintiff's remaining contentions which amount to an unpersuasive effort to have us reweigh conflicting engineering opinions. (*Western States Petroleum Assn. v. Superior Court*, *supra*, 9 Cal.4th at p. 572; *Environmental Council of Sacramento v. City of Sacramento*, *supra*, 142 Cal.App.4th at p. 1042.)

## 6. Response to July 1, 2011 letter

Plaintiff contends defendant failed to adequately respond to a July 1, 2011 letter. This contention has no merit. The brief, conclusory and factually unsupported July 1, 2011 letter was fully responded to prior to the conclusion of the environmental review proceedings and is part of the administrative record.

## B. Subsidence Issues

Plaintiff challenges the environmental impact report's subsidence mitigation measures. To begin with, the very truncated discussion in the opening brief omits virtually all of the relevant facts concerning the subsidence mitigation measures. Hence, the entire subsidence issue has been forfeited. (*Mani Brothers Real Estate State Group v. City of Los Angeles*, *supra*, 153 Cal.App.4th at p. 1402; *Citizens Opposing a Dangerous Environment v. County of Kern*, *supra*, 228 Cal.App.4th at p. 380, fn. 16.)

In any event, there is no merit to plaintiff's subsidence contentions. Defendant admits in the environmental impact report there is the potential for subsidence given the nature of tunneling operations. However, the following are the mitigation measures to address these issues: GT-1, monitoring future studies; GT-2, ground improvement methods; GT-3, tunnel alignment grouted in advance; GT-4, monitoring devices along

19

the route; and GT-5, use of particular machinery.  Taken together, as demonstrated below, there is substantial evidence these mitigation measures are sufficient to reduce the subsidence risks to less than significant levels.  (See *Friends of Kings River v. County of Fresno* (2014) 232 Cal.App.4th 105, 123 [three related mitigation measures considered together].)

The feasibility of the above subsidence mitigation measures is supported by substantial evidence.  Appendix U to the environmental impact report consists of a technical memorandum on geotechnical, subsurface, seismic and hazardous materials.  The technical memorandum was prepared by the Los Angeles consulting firm of Camp Dresser & McKee, Inc., which is commonly referred to as CDM.  The senior project manager for CDM was Virginia Jackson who had over 25 years experience working on transportation matters.  CDM began environmental and engineering work on the project in July, 2007.  Assisting in the subsidence analysis was the Parsons Brinckerhoff, Inc. firm's staff.

The memorandum evaluates potential impacts associated with the project area's geological conditions and concludes the proposed tunneling would give rise to potential adverse subsidence impacts.  The memorandum recommends certain measures to mitigate against potential subsidence:  a preconstruction study; construction monitoring; and limiting potential settlement to below an acceptable threshold value established during the final project design.  These enumerated mitigation measures are included as part of GT-1.  Other proposed mitigation measures are reflected in GT-2 through GT-5.

The February 3, 2012 final draft of the Building and Adjacent Structure Protection Report prepared by the Connector Partnership indicates, "As soon as any of the above buildings show a settlement value greater than 0.25 inches, compensation grouting will be activated under the building in order to counteract the settlement developing under it." Compensation grouting was described as an effective structure protection and settlement mitigation method.  The report concludes that by applying grout to a settlement of 0.25 inches, the damage would be negligible.

20

The April 2012 technical memorandum prepared by Ray Sosa and Bill Hansmith explains the use of the Boscardin and Cording method, which predicts potential damage to various structures. This technique was used to evaluate tunneling impacts on buildings adjacent to the alignment as required by mitigation measure GT-1. This method has gained worldwide acceptance in engineering practice. Further, by using compensation grouting, "[T]he settlement under these buildings could be controlled to acceptable levels." Also, the use of pressurized face tunnel boring machines could "limit ground loss at the tunnel face to minimal amounts." Substantial evidence supports defendant's less than significant impact findings after implementation of the mitigation measures in connection with potential subsistence. As with other issues, plaintiff's remaining subsidence contentions amount to an unpersuasive effort to have us reassess conflicting engineering opinions; something we are prohibited from doing. (*Western States Petroleum Assn. v. Superior Court*, *supra*, 9 Cal.4th at p. 572; *Environmental Council of Sacramento v. City of Sacramento*, *supra*, 142 Cal.App.4th at p. 1042.)

## C. Parking issues

There is no merit to defendant's parking contentions. Relying upon technical studies, the environmental impact report comprehensively evaluates the project's potential on-and-off street parking operational impacts and found such impacts to be insignificant. The environmental impact report's parking analysis relies upon appendix L which contains a technical memorandum prepared by CDM and Intueor Consulting Inc., an Irvine, California traffic engineering firm. The degreed professionals from Intueor Consulting, Inc were Farid S. Naguib, T.E, and Peter Kim, P.E. and T.E., both who had over 20 years engineering experience.

For example, the environmental impact report finds: "transit service can allow a neighborhood to grow while reducing its overall need for parking"; the project will "provide new non-auto access to the area, and partially offset the parking demand in the area."; the project is not expected to create a demand for additional parking and can

21

reduce existing parking demand by increasing transit access to the neighborhood; and because of the displacement of several businesses in the Little Tokyo area, there would be reduced parking demand. Thus, substantial evidence supports the finding that parking impacts would be less than significant. Plaintiff's analysis amounts to nothing more than a request that we reweigh conflicting engineering analysis; something we are prohibited from doing. (*Western States Petroleum Assn. v. Superior Court*, *supra*, 9 Cal.4th at p. 572; *Environmental Council of Sacramento v. City of Sacramento*, *supra*, 142 Cal.App.4th at p. 1042.)

## D. Response To Comments

Plaintiff argues that defendant failed to adequately respond to comments the draft environmental impact report posited during the public comment period. As defendant correctly notes, this issue was not raised in the trial court and is thus forfeited. (*El Morro Community Assn. v. California Dept. of Parks & Recreation* (2004) 122 Cal.App.4th 1341, 1351; *A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804.)

## V. DEFENDANT'S CROSS-APPEAL

Defendant cross-appeals, contending its judgment on the pleadings motion should have been granted. The trial court declined to rule on the judgment on the pleadings motion which asserts the project is exempt from environmental review requirements imposed by the California Environmental Quality Act. We are affirming the trial court's approval of defendant's certification of the environmental impact report. There is no effectual relief we can provide to defendant by reaching the merits of its exemption contention. Thus, all of defendant's exemption contentions are moot. (*Eye Dog*

22

*Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541; *Steiner v. Superior Court* (2013) 220 Cal.App.4th 1479, 1485.)

## VI.  DISPOSITION

The judgment is affirmed.  Defendant, The Los Angeles County Metropolitan Transit Authority, shall recover its costs incurred on appeal from plaintiff, Japanese Village LLC.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

KIRSCHNER, J.*

---

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

23